STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2021 CA 0732

TOYOTA MOTOR CREDIT CORPORATION

VERSUS

KIMBERLY L. ROBINSON, SECRETARY, DEPARTMENT OF
REVENUE, STATE OF LOUISIANA

Judgment Rendered: MAY 0 9 2022

Appealed from the
Board of Tax Appeals
State of Louisiana
Docket Number 9748D

Tony Graphia, Cade R. Cole, and Frances "Jay" Lobrano, Board Members
Presiding

*************

| | |
|---|---|
| William M. Backstrom, Jr.<br>Baton Rouge, LA | Counsel for Plaintiff/Second Appellant/<br>Appellee, Toyota Motor Credit Corporation |
| Christopher K. Jones<br>Antonio C. Ferachi<br>Baton Rouge, LA | Counsel for Defendant/First Appellant/<br>Appellee, Kimberly Robinson, in her<br>capacity as Secretary for the Department<br>of Revenue |

BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

**WHIPPLE, C.J.**

In this tax appeal involving a claim for refund of overpayment of franchise taxes, both parties appeal the judgment of the Board of Tax Appeals ("the BTA") granting in part and denying in part each of the parties' cross-motions for summary judgment, ordering a partial refund of franchise taxes, and dismissing all other claims. For the following reasons, we affirm.

## FACTUAL BACKGROUND

The facts in this matter were stipulated to by the parties and, thus, are not in dispute. Toyota Motor Credit Corporation ("TMCC"), a California corporation, is engaged in various lines of business, all of which it directs and manages from its headquarters in Torrance, California. TMCC's business at issue herein is its Retail Finance line of business, through which it acquires and services Retail Installment Contracts ("RICs") from independent motor vehicle dealers, thus receiving and collecting interest income from those RICs. A RIC is a finance agreement between an applicant/buyer of a motor vehicle and the originating motor vehicle dealer in connection with the sale of a motor vehicle by the dealer to the applicant/buyer. As such, the motor vehicle **dealer** negotiates the terms of the RIC with the **applicant/buyer**. TMCC is not a motor vehicle dealer and does not engage in the business of selling new motor vehicles. Thus, TMCC is not a party to any RICs. Rather, TMCC's business involves acquiring RICs from independent motor vehicle dealers after dealers have entered into them with their customers.

When a customer of a Toyota/Lexus motor vehicle dealer chooses to finance the purchase of a vehicle from the dealer, the customer and the dealer complete a "Credit Application," which the dealer submits to a financing institution, such as TMCC. When a Credit Application is submitted to TMCC by a motor vehicle dealer located in Louisiana, or by a limited number of motor vehicle dealers in Mississippi, the Credit Application is submitted electronically to a Credit Analyst

2

located at TMCC's Louisiana Dealer Sales and Services Office ("DSSO"). TMCC operates thirty DSSOs in the United States, including the one in Louisiana.

Upon receipt of the Credit Application, TMCC either approves or denies the Credit Application. If the Credit Application is approved, the motor vehicle **dealer** and the **applicant** may then decide to negotiate and enter into a RIC for the purchase of the motor vehicle.

After entering into RICs with their customers, motor vehicle dealers often offer to sell some or all of the RICs to various financing businesses, including TMCC. Upon acquisition of a RIC, TMCC begins servicing the RIC, and the buyer of the motor vehicle makes payments to TMCC under the terms of the RIC.

The "RICs at Issue" herein are those RICs originated by motor vehicle dealers located in Louisiana and Mississippi that were subsequently submitted by those dealers for review and consideration to TMCC's Contract Analysts in its Louisiana DSSO and then acquired by TMCC from those motor vehicle dealers. Thus, the essential issues presented in this appeal are whether the computation of TMCC's Louisiana franchise tax obligation should include the value of the RICs at Issue as property situated or used in Louisiana and/or whether the interest income TMCC earned thereon as sales or other revenue is attributable to Louisiana.

## PROCEDURAL HISTORY

On July 7, 2015, TMCC filed a Claim for Refund of Overpayment with the Louisiana Department of Revenue ("the Department"), requesting a refund for an alleged overpayment of its franchise taxes for the franchise tax period beginning on April 1, 2005 and ending on March 31, 2006 ("the 2005 Refund Period").[1] TMCC sought a refund in the amount of $1,047,592.00, contending that for the refund period at issue, it had "improperly" attributed all of the value of the RICs at

---

[1] At the request of the Department, TMCC also filed an amended Louisiana corporate franchise tax form for the franchise tax period at issue, to accompany its refund claim.

Issue and all interest income it received thereon to Louisiana in the calculation of its Louisiana franchise tax obligation, where the value of the RICs at Issue and all interest income received should have been attributed to TMCC's commercial domicile in California.[2] By letter dated March 24, 2016, the Department denied TMCC's refund claim.

After the denial of its refund claim, TMCC filed a Petition for Review with the BTA.[3] The Department, through its Secretary, Kimberly L. Robinson, and TMCC thereafter filed cross-motions for summary judgment, with the Department seeking dismissal of all of TMCC's refund claims and TMCC seeking judgment in its favor awarding it the requested refunds. Following a hearing on the cross-motions, the BTA signed a judgment dated February 10, 2021, granting in part and denying in part TMCC's motion and granting in part and denying in part the Department's motion.

Relying on its previous decision in GMAC Inc. v. Bridges, Docket Nos. 6998 - 7001, 7012, 7049, 7220, 7221 (La. B.T.A. 2014), 2014 WL 7642226,[4] the BTA concluded that because the value of the RICs at Issue should not have been allocated to Louisiana as property situated or used in Louisiana in the calculation of the apportionment of its franchise tax base, TMCC had made an overpayment of

---

[2] TMCC similarly filed Claims for Refund of Overpayment for the franchise tax period beginning on April 1, 2006 and ending on March 31, 2007 ("the 2006 Refund Period") and the franchise tax period beginning on April 1, 2007 and ending on March 31, 2008 ("the 2007 Refund Period"), on the same basis that it sought a refund for the 2005 Refund Period.

[3] Louisiana Revised Statute 47:1625(A)(1) provides that a taxpayer may appeal the disallowance of its claim for refund to the BTA within 60 days from the date of mailing of the notice of disallowance. The Department also denied TMCC's Claims for Refund of Overpayment for the 2006 and 2007 Refund Periods. TMCC likewise sought review of the denial of those claims. Each of TMCC's three Petitions for Review filed with the BTA was assigned a separate docket number.

[4] The issues presented in GMAC similarly dealt with whether the value of retail installment contracts acquired by GMAC from independent Louisiana GM dealers and the interest GMAC earned thereon should have been allocated as property situated or used in Louisiana and revenue attributable to Louisiana, respectively, in the determination of GMAC's Louisiana franchise tax liability. GMAC, 2014 WL 7642226 at *3-6. While informative as to the BTA's interpretation of the relevant statute and regulations, the BTA's decision in GMAC was never appealed to an appellate court and, thus, is not binding upon this court. See generally McDonald's Corporation v. Glennon, 355 So. 2d 1023, 1026 (La. App. 4th Cir.), writ denied, 357 So. 2d 1164 (La. 1978).

4

Louisiana corporate franchise taxes for the 2005 Refund Period in the amount of $797,517.00. Accordingly, the BTA granted in part TMCC's motion for summary judgment, denied in part the Department's motion for summary judgment, and ordered the Department to refund TMCC that amount, together with interest. However, again adhering to its earlier ruling in GMAC, and further concluding that interest earned on the RICs at Issue was properly allocated as Louisiana sales or revenue in the calculation of the apportionment of its franchise tax base, the BTA granted in part the Department's motion for summary judgment, denied in part TMCC's motion for summary judgment, and "denied and dismissed" TMCC's claim for all other amounts sought as a refund of overpayments of its 2005 franchise tax. From this judgment, both the Department and TMCC have appealed to this court.[5]

On appeal, the Department lists five assignments of error, contending that the BTA erred in: (1) granting TMCC a partial refund of franchise tax without the requisite showing of clear and convincing evidence that an error occurred; (2) determining that the business situs of the RICs at Issue was California, based on a limited analysis of TMCC's "use" of the RICs at Issue after acquisition; (3) determining that the business situs of the RICs at Issue was California without consideration of TMCC's continuous course of business in Louisiana, including the required pre-contract analyses of credit, lender activities, and continuous

---

[5]While TMCC filed three Petitions for Review addressing each of the three Refund Periods separately, which were each assigned a different docket number and never consolidated below, the BTA's February 10, 2021 judgment addressed all three Refund Periods for which TMCC sought a refund and collectively ordered a refund in the amount of $2,333,557.00, which represented $797,517.00 for the 2005 Refund Period, $847,491.00 for the 2006 Refund Period, and $688,549.00 for the 2007 Refund Period.

A copy of the BTA's February 10, 2021 judgment was then filed into each of the pending docket numbers before the BTA. Both TMCC and the Department filed separate appeals of the BTA's February 10, 2021 judgment as to each of the three refund periods. The present appeal concerns the 2005 Refund Period. The appeals relating to the 2006 Refund Period and the 2007 Refund Period are pending before this court and bear docket numbers 2021 CA 0733 and 2021 CA 0734 respectively. Upon motion of the parties, all three appeals were consolidated in this court for purposes of argument and submission only, and each consolidated appeal is addressed in a separate opinion, all rendered this date.

contact with Louisiana residents and vendors in servicing the RICs at Issue; (4) granting TMCC a partial refund of franchise tax without the requisite showing of clear and convincing evidence that the business situs for the RICs at Issue was California and not Louisiana; and (5) failing to consider the RICs at Issue as "trade accounts" or "trade notes receivable" under LSA-R.S. 47:606(A)(2)(c).

TMCC assigns two errors, contending that the BTA erred in: (1) holding that TMCC's interest receipts are from "[i]nterest on customers' notes and accounts" under LSA-R.S. 47:606(A)(1)(h) and, thus, were properly allocated to Louisiana in the computation of TMCC's Sales and Other Revenue Ratio; and (2) granting in part the Department's motion for summary judgment and denying in part TMCC's motion for summary judgment.

## SUMMARY JUDGMENT PRECEPTS

A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Jones v. Anderson, 2016-1361 (La. App. 1st Cir. 6/29/17), 224 So. 3d 413, 417. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(A)(3).

The initial burden of proof is on the mover. LSA-C.C.P. art. 966(D)(1). When the mover will bear the burden of proof at trial, the burden of showing that there is no genuine issue of material fact and that mover is entitled to judgment in its favor remains with the mover. Only when the mover makes this showing does the burden shift to the opposing party to present evidence demonstrating a material factual issue remains or that the mover is not entitled to judgment as a matter of law. See Action Oilfield Services, Inc. v. Energy Management Company, 2018-1146 (La. App. 1st Cir. 4/17/19), 276 So. 3d 538, 541-542.

6

Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is then on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. LSA-C.C.P. art. 966(D)(1).

Appellate courts review summary judgments *de novo*, using the same standards applicable to the trial court's determination of the issues, and ask the same questions the trial court does in determining whether summary judgment is appropriate. Cabana Partners, LLC v. Citizens Bank & Trust Co., 2018-0133 (La. App. 1st Cir. 12/21/18), 269 So. 3d 986, 990. See also LSA-C.C.P. art. 966(A)(3).

## LOUISIANA CORPORATE FRANCHISE TAX

Article VII, section 1 of the Louisiana Constitution vests the power of taxation in the legislature. Pursuant to this authority, the legislature enacted the Louisiana corporate franchise tax, LSA-R.S. 47:601 *et seq.* Louisiana's corporation franchise tax statute, as applied to foreign corporations, taxes the corporation's privilege of enjoying, in a corporate capacity, the ownership or use of its capital, plant, or other property in this state, the corporation's privilege of exercising and continuing its corporate charter in Louisiana, and the corporation's use of its corporate form to do business in this state. Colonial Pipeline Company v. Agerton, 289 So. 2d 93, 100 (La. 1974). As such, "[e]very foreign corporation, exercising its charter, or qualified to do business or actually doing business in this state, or owning or using any part or all of its capital, plant, or any other property

7

in this state" is obligated to pay an annual franchise tax on its "taxable capital." LSA-R.S. 47:601(A) & 602.[6]

A corporation's taxable capital for purposes of determining its Louisiana franchise tax is computed on the basis of a ratio obtained by taking the "arithmetical average" of: (1) the ratio that its net sales and other revenue attributable to Louisiana (the numerator) bears to its total net sales and other revenue (the denominator), hereinafter referred to as "the Sales and Other Revenue Ratio", and (2) the ratio that the value of its property or assets situated or used in Louisiana (the numerator) bears to the value of all of its property and assets wherever situated or used (the denominator), hereinafter referred to as "the Property Ratio." LSA-R.S. 47:606(A)(1) & (2).

## REFUND OF OVERPAYMENT OF TAXES

While vested with the power to tax, the legislature must also "provide a complete and adequate remedy for the prompt recovery of an illegal tax paid by a taxpayer." LSA-Const. art. VII, § 3(A); Jazz Casino Company, L.L.C. v. Bridges, 2016-1663 (La. 5/3/17), 223 So. 3d 488, 492. Pursuant to LSA-R.S. 47:1621 – 1627, taxpayers are afforded a procedure for the refund of overpayments of taxes that were paid voluntarily and without protest. Bannister Properties, Inc. v. State, 2018-0030 – 2018-0033 (La. App. 1st Cir. 11/2/18), 265 So. 3d 778, 788, writ denied, 2019-0025 (La. 3/6/19), 266 So. 3d 902. An overpayment of taxes includes a "payment of tax ... when none was due" or "the excess of the amount of tax ... paid over the amount due." LSA-R.S. 47:1621(A).

If the Department denies the taxpayer's refund claim, the taxpayer may

---

[6]Louisiana Revised Statutes 47:601(A) and 602 were amended by Louisiana Acts 2004, 1st Extraordinary Session, No. 2, section 1, effective January 1, 2006, for taxable years beginning after December 31, 2005. La. Acts 2004, No. 2, § 4. Thus, those amendments are not pertinent to the 2005 Refund Period. Moreover, those amendments are not at issue in the consolidated appeals before this panel addressing TMCC's clams for refunds for the 2006 and 2007 Refund Periods.

appeal the denial to the BTA. Jurisdiction to resolve tax-related disputes is granted to the BTA, which is authorized to hear and decide disputes and render judgments. LSA-R.S. 47:1625; St. Martin v. State, 2009-0935 (La. 12/1/09), 25 So. 3d 736, 741. The BTA functions as a trial court in finding facts and applying the law. St. Martin, 25 So. 3d at 740.

Jurisdiction for judicial review of decisions of the BTA is vested solely with the appellate courts. LSA-R.S. 47:1435. The appellate court's review of a decision of the BTA is rendered on the record made before the BTA and is limited to facts on record and questions of law. Bannister Properties, Inc., 265 So. 3d at 785. With regard to questions of law, the judgment of the BTA should be affirmed if it has correctly applied the law and adhered to the proper procedural standards. However, if the BTA's judgment is not in accordance with law, it may be reversed or modified, with or without remanding the case. Bannister Properties, Inc., 265 So. 3d at 785.

## DISCUSSION

### Whether the Value of the RICs at Issue Should be Allocated to Louisiana in TMCC's "Property Ratio" in Computing TMCC's Franchise Tax Liability
### (The Department's Assignments of Error Nos. 1 – 5)

The Department challenges that portion of the BTA's judgment granting in part TMCC's motion for summary judgment and awarding it a partial refund of franchise taxes due to TMCC's error in computing its Property Ratio in determining its franchise tax liability for the 2005 Refund Period. According to the Department, TMCC failed to meet its burden of proving entitlement to judgment in its favor granting a refund because the value of the RICs at Issue was properly allocated to Louisiana in TMCC's Property Ratio. Through its assignments of error, the Department raises three primary issues: (1) what is the appropriate burden of proof for TMCC to establish its entitlement to a refund; (2) whether the RICs at Issue are properly considered "trade notes and trade accounts,"

9

such that TMCC failed to meet its burden of proving that they should not be allocated to Louisiana in its Property Ratio; and (3) if, in fact, the RICs at Issue are "other" notes and accounts, rather than "trade notes and trade accounts," whether TMCC met its burden of establishing that the business situs of the RICs at Issue was not Louisiana, such that they should not be allocated to Louisiana in its Property Ratio.

Because TMCC would have the burden of proof at a trial of establishing its entitlement to a refund, in order to demonstrate its entitlement to summary judgment, TMCC had to establish that there was no genuine issue of fact and that it was entitled to judgment in its favor. See Action Oilfield Services, Inc., 276 So. 3d at 541-542. Because the facts herein were stipulated by the parties, TMCC had the burden of proving that under the established facts, it was entitled to a refund as a matter of law.[7]

In its first and fourth assignments of error, the Department contends that the BTA did not hold TMCC to the appropriate burden of proof and that, under the appropriate burden of proof, TMCC failed to establish its entitlement to judgment as a matter of law. The Department asserts that TMCC has a heightened burden because tax statutes providing for tax refunds are strictly construed against the taxpayer. Additionally, it argues that if a taxpayer cannot prove entitlement to a refund under any of the provisions of LSA-R.S. 47:1621(B), as it asserts TMCC cannot, then a refund may only occur if the overpayment is proven by clear and convincing evidence.

Louisiana Revised Statute 47:1621(B) sets forth the instances in which the Department **shall** make a refund of overpayments, including, as pertinent herein, where "[t]he overpayment was the result of an error, omission, or a mistake of fact

---

[7]TMCC filed as an exhibit to its motion the parties' "Consolidated Joint Stipulation of Facts" and the exhibits attached thereto.

of consequence to the determination of the tax liability, whether on the part of the taxpayer or the secretary." LSA-R.S. 47:1621(B)(3). Subsection (C) of LSA-R.S. 47:1621 further provides that "[n]otwithstanding the provisions of Subsection B, where it is determined that there is clear and convincing evidence that an overpayment has been made, the secretary shall make a refund, subject to conditions or limitations provided by law."

In its motion for summary judgment, TMCC sought judgment in its favor granting a refund on the basis that it had erroneously allocated the value of the RICs at Issue to Louisiana in computing its Property Ratio when calculating its franchise tax liability pursuant to LSA-R.S. 47:606. Additionally, in the Consolidated Joint Stipulation of Facts, the parties stipulated that TMCC was seeking a refund of alleged overpayment and that, if the value of the RICs at Issue should not have been allocated to Louisiana in computing TMCC's Property Ratio (i.e., included in the numerator of TMCC's Property Ratio), TMCC made an overpayment of franchise tax for the tax refund period at issue.

Clearly, if it is determined that the value of the RICs at Issue should not have been allocated as property situated or used in Louisiana in computing TMCC's Property Ratio, TMCC's allocation of the RICs at Issue as such was "an error ... of consequence to the determination of [its] tax liability" under LSA-R.S. 47:1621(B)(3). See generally Sasol North America, Inc. v. Louisiana Department of Revenue, 15-569 (La. App. 3rd Cir. 2/10/16), 184 So. 3d 902, 906, writ denied, 2016-0482 (La. 5/2/16), 206 So. 3d 878.

Moreover, while the Department is correct that statutes providing for tax exemptions or tax refunds should be strictly construed against the taxpayer, Bannister Properties, Inc., 265 So. 3d at 791, the determination of whether TMCC is entitled to a refund for overpayment of its franchise taxes involves the interpretation and application of LSA-R.S. 47:606, a statute **imposing** a franchise

11

tax, to the undisputed facts herein.[8] Taxing statutes are to be interpreted liberally in favor of the taxpayer and against the taxing authority, and where a tax statute is susceptible of more than one interpretation, the interpretation less onerous to the taxpayer is to be adopted. Barfield v. Bolotte, 2015-0847 (La. App. 1st Cir. 12/23/15), 185 So. 3d 781, 785, writ denied, 2016-0307 (La. 5/13/16), 191 So. 3d 1058. As such, words defining things to be taxed should not be extended beyond their clear import. Barfield, 185 So. 3d at 785. For these reasons, we disagree that LSA-R.S. 47:606 must be strictly construed against TMCC. Further, to the extent the Department asserts in assignments of error numbers one and four that the clear and convincing standard applies to LSA-R.S. 47:1621(B), we find no merit in this argument.

Turning to the merits of the Property Ratio issue, in its fifth assignment of error, the Department asserts that the RICs at Issue meet the definition of "trade notes receivable" as set forth in LSA-R.S. 47:606(A)(2)(c), such that they were properly allocated as property situated or used in Louisiana in TMCC's Property Ratio, and that the BTA erred in concluding otherwise.

As stated above, the Property Ratio for purposes of determining franchise tax is the value of the taxpayer's property and assets situated or used in Louisiana in relation to the value of all of the taxpayer's property and assets, wherever situated or used. LSA-R.S. 47:606(A)(2). Regarding the allocation of property

---

[8]We note that the cases relied upon by the Department in this regard are all factually distinguishable and, thus, inapplicable in that they involve interpretation of various tax exemptions. See Sherwood Forest Country Club v. Litchfield, 2008-0194 (La. 12/19/08), 998 So. 2d 56 (interpreting a constitutional exemption of property owned by certain associations from ad valorem taxes); Mallard Bay Drilling, Inc. v. Kennedy, 2004-1089 (La. 6/29/05), 914 So. 2d 533 (interpreting a sales tax exemption); Whitten Foundation v. Granger, 2004-0934R (La. App. 1st Cir. 11/3/06), 950 So. 2d 720, writ denied, 2006-2828 (La. 2/2/07), 948 So. 2d 1080 (interpreting an exemption from ad valorem taxes); and Johnson v. New Orleans Charities Building Corporation, 2000-2772 (La. App. 1st Cir. 2/15/02), 812 So. 2d 741 (interpreting an exemption from ad valorem taxes). Bannister is also distinguishable because it concerned the interpretation of LSA-R.S. 47:1621(F) and whether the taxpayer was entitled to a refund pursuant to this provision. Bannister, 265 So. 3d at 788. In Bannister, the parties stipulated that the taxpayer overpaid its franchise taxes; therefore, the interpretation and application of LSA-R.S. 47:606 was not at issue.

and assets to Louisiana or elsewhere, LSA-R.S. 47:606(A)(2) provides, in pertinent part, as follows:

> The various classes of property and assets shown below shall be allocated within and without Louisiana on the bases indicated:
>
> * * *
>
> (b) Cash in banks and temporary cash investments shall be allocated to the state in which they have their business situs, or in the absence of a business situs, to the state in which is located the commercial domicile of the taxpayer.
>
> (c) Trade accounts and trade notes receivable shall be allocated by reference to the transactions from which the receivables arose, on the basis of the location at which delivery was made in the case of sale of merchandise or the location at which the services were performed in case of charges for services rendered.
>
> (d) Investments in and advances to a parent or subsidiary shall be allocated as provided in Subsection B of this Section.
>
> (e) Notes and accounts other than those notes and accounts described under items (b) through (d) above shall be allocated to the state in which they have their business situs, or in the absence of a business situs, to the state in which is located the commercial domicile of the taxpayer.

In support of its motion for summary judgment, TMCC contended that the RICs at Issue were not "[t]rade accounts and trade notes receivable" pursuant to LSA-R.S. 47:606(A)(2)(c), but, rather, were "other" notes and accounts pursuant to LSA-R.S. 606(A)(2)(e) and that the RICs at Issue had a business situs outside of Louisiana. Contrariwise, the Department, in opposing TMCC's motion, contended that regardless of whether the RICs at Issue were classified as "[t]rade accounts and trade notes receivable" or "other" notes and accounts, the value of the RICs at Issue was properly allocated to Louisiana.

The term "[t]rade accounts and trade notes receivable" is not defined in LSA-R.S. 47:606(A)(2)(c). However, the Department has promulgated regulations defining which notes and accounts qualify as "[t]rade accounts and trade notes" and the basis for allocating such property to a particular state, in pertinent part, as follows:

13

Trade accounts and **trade notes receivable are construed to mean** only those accounts and **notes** receivable *resulting from* **the sale of merchandise or the performance of services for customers in the regular course of business of the taxpayer.** Such accounts and notes shall be allocated to the location at which the merchandise was delivered or at which the services were performed resulting in the receivable. ...

LAC 61:I.306.A.2.c[9] (emphasis added). On appeal, the Department contends that the RICs at Issue are "trade notes receivable" because they "relate to TMCC's business of lending money to persons for their use in purchasing vehicles or providing financing to Louisiana automobile dealers" and, thus, "are the result of the financing services performed by TMCC in this state."

However, we note that, according to the Consolidated Joint Stipulation of Facts, TMCC is not a motor vehicle dealer and does not engage in the business of selling new motor vehicles. As such, TMCC clearly is not a party to the RICs at Issue at their inception, which, instead, are entered into and binding between motor vehicle dealers and their buyers. Rather, TMCC's business involves the **acquisition,** ownership, and servicing of RICs that have been executed by the selling motor vehicle dealers and their customers, the buyers of motor vehicles, and then later offered for sale by motor vehicle dealers. Thus, the RICs at Issue did not "**result[] from** the sale of merchandise ... [to] customers in the regular course of business of the **taxpayer** [TMCC]," but, instead, result from the sale of merchandise, i.e., motor vehicles, in the regular course of business of the **motor**

---

[9]Pursuant to the authority granted in LSA-R.S. 47:1511, to promulgate rules and regulations in accordance with the Administrative Procedure Act, LSA-R.S. 49:950 et seq., the Secretary of the Department amended this regulation in 2006, as promulgated in the Louisiana Register on March 20, 2006, near the end of the 2005 Refund Period at issue herein. See La. Reg. 32:415 (2006). A rule promulgated under the Administrative Procedure Act, LSA-R.S. 49:949 et seq., "shall be effective upon its publication in the Louisiana Register, said publication to be subsequent to the act of adoption, except that if a later date is required by statute or specified in the rule, the later day is the effective date." LSA-R.S. 49:954(B)(1). However, the amendments to the Department's regulation were non-substantive, stylistic changes that do not impact any holdings herein.

14

**vehicle dealers** from whom TMCC later purchased the RICs at Issue.[10] See LAC 61:I.306.A.2.c (emphasis added).

Nonetheless, the Department argues on appeal that the BTA's reliance on its earlier decision in GMAC was misplaced because, in that decision, the BTA did not address the "performance of services" component of "[t]rade accounts and trade notes receivable," see GMAC, 2014 WL 7642226 at *4-5, and, further, the RICs at Issue "are the result of financing services performed by TMCC in this state," in that "TMCC provides financial services to persons who are seeking to purchase automobiles as well as to automobile dealerships who [sic] desire to reduce their debt load by the sale of such contracts." However, as set forth in the Consolidated Joint Stipulation of Facts, TMCC does not lend money to the buyers of motor vehicles through the RICs at Issue, which, again, are executed by motor vehicle dealers and their customers; thus, TMCC cannot be deemed to have provided financial services to those purchasers. Rather, to the extent that it acquires the RICs at Issue from motor vehicle dealers to assist them in reducing their debt load, TMCC may provide financial services to the motor vehicle dealers, but those financial services do not "result" in the RICs at Issue, which have previously been executed between motor vehicle dealers and their customers as the result of the sale of motor vehicles.

Moreover, any review of Credit Applications by TMCC on behalf of the motor vehicle dealers prior to confection of a RIC cannot be said to **result** in the RICs at Issue. Instead, as the parties stipulated, all negotiations as to the terms of the sale of the motor vehicle, including, for example, price, down payment, and trade-in credit, *and as to the terms of the RICs themselves*, take place between the motor vehicle dealers and their customers. TMCC does not review, approve, or

---

[10]Indeed, the terms under which TMCC acquires the RICs at Issue is governed by a separate agreement, entitled Retail Sales Financing Agreement, entered into between TMCC and each Louisiana Toyota/Lexus motor vehicle dealer.

15

disapprove any RIC prior to its execution by the motor vehicle dealer and its customer. As such, the RICs at Issue "result" from negotiations between the motor vehicle dealers and their customers, leading to the sale of a motor vehicle and financing of same. Additionally, the RICs at Issue clearly did not "result" from any servicing of the RICs at Issue by TMCC after it acquired the fully executed RICs from selling motor vehicle dealers.

Accordingly, on *de novo* review, we find no error by the BTA in its determination that the RICs at Issue were not "trade accounts" or "trade notes receivable" pursuant to LSA-R.S. 47:606(A)(2)(c) and LAC 61:I.306.A.2.c and, thus, find no merit to the Department's fifth assignment of error. As such, the RICs at Issue qualify as "other" notes and accounts pursuant to LSA-R.S. 47:606(A)(2)(e), whose allocation is dependent upon an analysis of where they have their "business situs" or, in the absence of a business situs, where the commercial domicile of TMCC is located.

In support of its motion for summary judgment, TMCC contended that the RICs at Issue were "other" notes and accounts with a business situs outside of Louisiana because once TMCC acquires the RICs at Issue, and thus can "use" them, TMCC's only use of the RICs at Issue was at its commercial domicile in California. Conversely, in its opposition to TMCC's motion, the Department contended that even if the RICs at Issue were classified as "other" notes and accounts," their value nonetheless should have been allocated as Louisiana sales and other revenue because those RICs at Issue had indeed obtained a business situs in Louisiana. On appeal, the Department asserts, through its second, third, and fourth assignments of error, that the BTA erred in concluding that under either the "business situs" test or the "commercial domicile" test, the value of the RICs at Issue was not to be allocated to Louisiana.

As noted by the Louisiana Supreme Court, because, by their very nature,

16

intangible assets and property rights have no physical location, even though represented by "paper evidences," being merely relationships between persons that the law recognizes "by attaching to them certain sanctions enforceable in the courts," the problem of determining their situs, or the state having jurisdiction to tax them, is complex. United Gas Corporation v. Fontenot, 241 La. 488, 498, 129 So. 2d 748, 752 (1961). The Department's regulations offer guidance in the determination of business situs of "other" notes and accounts and the commercial domicile of the taxpayer for computing the Property Ratio, in pertinent part, as follows:

> Notes and accounts receivable other than temporary cash investments, trade notes and accounts, and advances to a parent or subsidiary, shall be allocated to the state in which they have their business situs if they have been so used as to have acquired a business situs. In the absence of a business situs for such assets, notes and accounts receivable other than temporary cash investments, trade notes and accounts, and advances to a parent or subsidiary shall be allocated to the state in which the commercial domicile of the taxpayer is located. See § 306.A.1.g[11] relative to business situs and commercial domicile.

LAC 61:I.306.A.2.e.

> Used in connection with the taxpayer's business is construed to mean **use of a continuing nature** in the regular course of business and does not include the mere holding of the instrument at a location of the use of the property as security for credit. Business situs must be established on the basis of facts, indicating precisely the use to which the securities have been put and the manner in which the taxpayer conducts its business.

LAC 61:I.306.A.1.g.ii (emphasis added).[12]

> Commercial Domicile is in that state where management decisions are implemented which is presumed to be the state where the taxpayer conducts its principal business and thereby benefits from public

---

[11]Prior to the 2006 amendment to this regulation, which amendment was promulgated in the Louisiana Register on March 20, 2006, near the end of the Refund Period at issue, section 306.A.1.g had been designated as section 306.A.1.h. La. Reg. 32:415 (2006). However, because the substance of the regulation was not changed, we refer to it herein by its current designation for ease of reference.

[12]This portion of the regulation was similarly re-designated from section 306.A.1.h.ii to section 306.A.1.g.ii, by amendment promulgated on March 20, 2006, near the end of the Refund Period at issue. La. Reg. 32:415 (2006). Because the substance of this portion of the regulation was not changed, we refer to it herein by its current designation for ease of reference.

facilities and protection provided by that state. ...

LAC 61:I.306.A.1.g.iii.[13]

The parties stipulated that TMCC's commercial domicile is in California. Thus, the RICs at Issue are to be allocated to California unless they have obtained a business situs of their own. According to the Consolidated Joint Stipulation of Facts, TMCC's Retail Finance line of business involves "the **acquisition, ownership**, and **servicing** of the RICs and receiving and collecting interest income from the RICs."[14] Thus, we will consider each of these activities separately in determining whether TMCC's use of the RICs at Issue in Louisiana was "of a continuing nature in the regular course of [TMCC's] business" such that the RICs at Issue obtained a business situs in Louisiana, subjecting their value to Louisiana franchise taxes. LAC 61:I.306.A.2.e; LAC 61:I.306A.I.g.ii.

In carrying out its Retail Finance line of business, the process by which TMCC **acquires** the RICs at Issue involves several steps. As mentioned above, as a preliminary matter before a RIC is ever confected between a Toyota/Lexus motor vehicle dealer and its customer, the motor vehicle dealer and the customer complete a Credit Application, which may or may not be completed on a form created by TMCC. Toyota/Lexus motor vehicle dealers may then choose to submit the Credit Application to TMCC for review. When the motor vehicle dealer submits a Credit Application to TMCC or to competing finance companies, the motor vehicle dealer is looking for a lender with the best interest rate and loan terms for its customer. Toyota/Lexus motor vehicle dealers are under no obligation to submit Credit Applications to TMCC and often submit them to

---

[13]This subsection of section 306 was likewise re-designated from section 306.A.1.h.iii to section 306.A.1.g.iii, by amendment promulgated on March 20, 2006, near the end of the Refund Period at issue. While a portion of this subsection was amended substantively, the relevant portion quoted above was not amended. For ease of reference, we also refer to its current designation.

[14]TMCC also engages in wholesale finance and retail leasing, but any income or properties related to those lines of business are not at issue herein.

competing financing businesses. For Louisiana and a limited number of Mississippi Toyota/Lexus motor vehicle dealers, this preliminary credit review does occur in Louisiana at TMCC's Louisiana DSSO. Once a Credit Application is electronically submitted to TMCC's Louisiana DSSO, a Credit Analyst performs the required review under procedures developed by TMCC at its headquarters in California. After a Credit Application is "approved" by TMCC, either through "auto-approval" by TMCC's software system or by the Credit Analyst, the motor vehicle dealer and its customer may then decide to negotiate and enter into a RIC for the purchase of a motor vehicle.

Thus, this credit review process appears to aid the Toyota/Lexus dealer in its decisions as to whether to provide financing to its customer and whether to provide such financing under terms approved by TMCC or by another competing financing company, and also serves the purpose of aiding TMCC in its later decision-making process as to whether to purchase a RIC if actually confected by the dealer and its customer and then offered for sale to TMCC. However, at this preliminary stage of review of the Credit Application, the potential RIC has not yet come into existence and, thus, cannot be said to be "used" by TMCC in the course of its Retail Finance business.

After a Toyota/Lexus motor vehicle dealer and its customer do enter into a RIC for the purchase of a motor vehicle, the motor vehicle dealer may then choose to offer to sell the RIC to TMCC, and in that event, TMCC conducts its "due diligence" review with respect to the RIC. Where a dealer decides to submit a RIC to TMCC for acquisition, the RIC and other required documentation are submitted to TMCC's Contract Analysts at one of TMCC's DSSOs. As pertinent to this case, TMCC's decision-making process as to whether to purchase the RICs at Issue undisputedly was conducted by Contract Analysts in TMCC's Louisiana DSSO, under the following procedure. Upon receipt of a RIC at Issue, a Contract Analyst

reviews the RIC at Issue in accordance with the procedures created at TMCC's headquarters in California. Once a Contract Analyst completes review of the RIC at Issue, the Contract Analyst decides whether TMCC will acquire or reject the RIC. Where TMCC has already approved the applicant's Credit Application and the motor vehicle dealer has offered to sell the RIC to TMCC, it is routine, but not required, for TMCC to acquire the RIC. With regard to TMCC's purchase of RICs, each Louisiana Toyota/Lexus motor vehicle dealer is required to enter into a Retail Sales Financing Agreement with TMCC, which governs the terms and conditions of the purchase of RICs by TMCC from these dealers.

Clearly, TMCC's decision-making process as to whether to purchase the RICs at Issue was conducted in Louisiana, with its Contract Analysts utilizing the RICs at Issue in the decision-making process, albeit under procedures developed by TMCC in California. Thus, as to TMCC's business of **acquiring** RICs, the RICs at Issue were used by TMCC for review in conducting its due diligence in deciding whether to acquire the RICs. However, TMCC was not using the RICs at Issue as the owner thereof at this stage of TMCC's acquisition decision-making process, such that the RICs at Issue were not the property of TMCC at this stage of its business activities.

Turning to TMCC's **ownership** of RICs, upon the transfer of ownership of a RIC from a Toyota/Lexus motor vehicle dealer, a TMCC Contract Analyst records the RIC in TMCC's retail system. Once the acquired RIC is recorded in TMCC's retail system, the Contract Analyst sends the RIC and all supporting documentation to a third-party provider for scanning and shredding. TMCC retains and maintains the scanned electronic copies of all acquired RICs at one of its three Customer Service Centers ("CSCs"), none of which are located in Louisiana. Thus, as to TMCC's **ownership** of the RICs at Issue, other than the initial recording of the RICs at Issue into TMCC's retail system and forwarding them to a third-party

provider for further processing, no other activities were conducted at TMCC's Louisiana DSSO.

Finally, regarding TMCC's **servicing** of the RICs at Issue, once the Contract Analyst records the RICs at Issue into TMCC's retail system, the system begins to automatically issue billing statements to those buyers, which bills are mailed on a monthly basis to the buyers. This retail system likewise is located and maintained outside of Louisiana. TMCC thereafter manages and services the RICs at Issue at one of its CSCs outside of Louisiana, and TMCC's representatives at the CSCs have all future contact with the buyers, including, for example, service calls, account collections and administration. All payments on the RICs at Issue are made either to a lockbox in Illinois or through electronic banking services. No payments are received at the Louisiana DSSO. Moreover, all lockbox and electronic payments are deposited in bank accounts maintained by TMCC at its commercial domicile in California.

Additionally, TMCC commonly securitizes RICs it has purchased, including the RICs at Issue. However, all activities relating to the securitization of RICs acquired by TMCC, including the RICs at Issue, also occur outside of Louisiana.

At times, a buyer may default on an RIC at Issue. Each RIC is secured by the motor vehicle purchased by the buyer. Thus, in the case of default by a buyer on a RIC at Issue, if a motor vehicle securing the RIC at Issue is physically located in Louisiana at the time of default, a representative at one of TMCC's CSCs attempts to contact the buyer by phone to reach a solution to the default and get the buyer back into compliance with the payment terms of the RIC at Issue. If the CSC representative is unable to reach a solution to the buyer's default, the representative sends a letter to the buyer to notify the buyer of the default and of

21

TMCC's intention to exercise its rights and remedies.[15] For those RICs at Issue executed in Louisiana, TMCC could then proceed with repossession of the motor vehicle after seven days, under Louisiana law. Because only an individually licensed repossession agent is authorized to take possession of a defaulting buyer's financed vehicle in Louisiana, TMCC contracts with authorized third parties to seize the financed vehicle. This procedure does not require the filing of any pleading in a Louisiana court. Moreover, for the Refund Period at issue, TMCC did not file any lawsuits in Louisiana against defaulting buyers.

After the vehicle has been repossessed, a CSC representative mails a notice to the defaulting buyer of its plan to sell the repossessed vehicle and files a notice of repossession with the Recorder of Mortgages in the Louisiana parish where the vehicle is located and with either the city court constable or marshal or the sheriff of the parish where the defaulting buyer resides. TMCC will then sell the repossessed vehicle at a private auction outside of Louisiana. Once the vehicle is sold at auction, a CSC representative mails a notice of surplus or deficiency to the defaulting buyer at the buyer's last known address, and TMCC then engages third-party collection agencies to pursue collection of any deficiency under Louisiana law.[16] None of TMCC's DSSOs, including the Louisiana DSSO, is involved if there is a default by the buyer.

Under the facts stipulated above, following TMCC's purchase of the RICs at Issue, its activities in Louisiana related to its use of the RICs at Issue primarily involved limited activities in instances of default, while many actions taken by TMCC related to defaulted RICs at Issue also took place outside of Louisiana. Thus, other than the initial activity of recording the RICs at Issue into TMCC's

---

[15]For the RICs at Issue, Louisiana law controls TMCC's legal rights for those RICs executed in Louisiana, and, likewise, Mississippi law controls for those RICs executed in Mississippi.

[16]The parties did not stipulate to the percentage of the RICs at Issue that have gone into default and required repossession and sale at auction.

retail system and some actions related to repossession and collection of any deficiency following sale at auction as to only those RICs at Issue that have gone into default, the majority of TMCC's business activities related to **servicing** the RICs at Issue occurs outside of Louisiana.

On *de novo* review, considering all of TMCC's business activities related to the RICs at Issue, which occurred in more than one state, and mindful that any doubt or ambiguity as to the authority to tax must be resolved in favor of the taxpayer, United Gas Corporation v. Fontenot, 241 La. 564, 579-580, 129 So. 2d 776, 781 (1961), we conclude that the RICs at Issue cannot be said to have acquired a business situs in Louisiana because there was no "use of a continuing nature" in Louisiana "in the regular course" of TMCC's Retail Finance line of business. See LAC 61:I.306.A.2.e. While TMCC's business in this state involved the acquisition of the RICs at Issue and limited activities related only to those RICs at Issue that went into default, its use of the RICs at Issue extended well beyond those activities, with the vast majority of its use, and its "use of a continuing nature," of the RICs at Issue occurring outside of Louisiana. Thus, we find no merit to the Department's argument in assignments of error numbers two, three, and four that the "business situs" of the RICs at Issue was Louisiana.

Accordingly, we find no error in the BTA's conclusion that the RICs at Issue were "other" notes and accounts pursuant to LSA-R.S. 47:606(A)(2)(e) that had not acquired a business situs in Louisiana. Thus, the RICs at Issue should not have been allocated as property located or used in Louisiana in computing TMCC's Property Ratio (i.e., included in the numerator of TMCC's Property Ratio) for the determination of its franchise tax liability for the 2005 Refund Period. Because the overpayment at issue was "the result of an error, omission, or a mistake of fact of consequence to the determination of the tax liability" pursuant to LSA-R.S. 47:1621(B)(3), TMCC was entitled to a refund in the stipulated amount of

23

$797,517.00 for its erroneous calculation related to its Property Ratio for the 2005 Refund Period.

## Whether the Interest Earned on the RICs at Issue Should Be Allocated to Louisiana in TMCC's Sales and Other Revenue Ratio in Computing TMCC's Franchise Tax
## (TMCC's Assignments of Error Nos. 1 & 2)

Turning now to **TMCC's** appeal, TMCC contends that the BTA erred in granting in part the Department's motion for summary judgment, denying in part its motion for summary judgment, and dismissing in part TMCC's refund claim as to franchise taxes paid pursuant to its erroneously calculated Sales and Other Revenue Ratio.[17] Through its two assignments of error, TMCC argues that the interest it earned on the RICs at Issue should not have been allocated to Louisiana in the calculation of its Sales and Other Revenue Ratio for the Refund Period at issue.

A taxpayer's Sales and Other Revenue Ratio for purposes of determining franchise tax is the "ratio that the net sales made to customers in the regular course of business and other revenue attributable to Louisiana bears to the total net sales made to customers in the regular course of business and other revenue." LSA-R.S. 47:606(A)(1). Regarding the allocation of sales and other revenue to Louisiana or elsewhere, LSA-R.S. 47:606(A)(1) provides, in pertinent part, as follows:

> For the purposes of this Subsection net sales and other revenues attributable to Louisiana shall be determined as follows:
>
> * * *
>
> (h) Interest on customers' notes and accounts shall be attributed to the state in which such customers are located.
>
> (i) Other interest and dividends shall be attributed to the state in which the securities or credits producing such revenue have their situs, which shall be at the business situs of such securities or credits, if they have been so used in connection with the taxpayer's business as to

---

[17]The denial of a motion for summary judgment is an interlocutory judgment and is appealable only when expressly provided by law. However, where there are cross motions for summary judgment raising the same issues, this court can review the denial of a summary judgment in addressing the appeal of the granting of the cross motion for summary judgment. Pelle v. Munos, 2019-0549 (La. App. 1st Cir. 2/19/20), 296 So. 3d 14, 18 n.2.

acquire a business situs, or, in the absence of such a business situs shall be at the commercial domicile of the corporation.

LSA-R.S. 47:606(A)(1)(h) & (i).

In support of its motion for summary judgment and on appeal, TMCC contends that the interest earned on the RICs at Issue should not have been allocated to Louisiana under either LSA-R.S. 47:606(A)(1)(h) or (i). Specifically, TMCC asserts that the interest on the RICs at Issue is not "[i]nterest on customers' notes and accounts" pursuant to LSA-R.S. 47:606(A)(1)(h) because the "customer" in each of the RICs at Issue (and, thus, the "customer" paying the interest) was not TMCC's customer, but instead was the customer of the selling motor vehicle dealer. Thus, TMCC contends that the interest on the RICs at Issue was instead "[o]ther interest" under LSA-R.S. 47:606(A)(1)(i), and because the RICs at Issue do not have a business situs in Louisiana, the interest thereon should not be allocated to Louisiana in its Sales and Other Revenue Ratio.

The Department, on the other hand, contends that the interest on the RICs at Issue was properly allocated as Louisiana sales and other revenue pursuant to LSA-R.S. 47:606(A)(1)(h) because such a determination is consistent with the plain language of the statute, applicable regulations, and pertinent jurisprudence. The Department further asserts that TMCC's argument that LSA-R.S. 47:606(A)(1)(h) would apply only if the customers who entered into the RICs at Issue were TMCC's direct customers is wholly without merit.

As to the allocation rule in LSA-R.S. 47:606(A)(1)(h) that "[i]nterest on customers' notes and accounts shall be attributed to the state in which such customers was located," the Department promulgated regulations, providing further instruction regarding this allocation, in pertinent part, as follows:

f. Interest on Customers' Notes and Accounts

i. Interest on customers' notes and accounts can generally be associated directly with the specific credit instrument or account upon

25

which the interest is paid and shall be attributed to the state at which the goods were received by the purchaser or services rendered. ...

LAC 61:I.306.A.1.f.[18]

We find the language of both LSA-R.S. 47:606(A)(1)(h) and LAC 61:I.306.A.1.f to be clear, and, contrary to TMCC's argument on appeal, there is nothing in the language of either the statute or the corresponding regulation requiring that the customer obligated on the note, and, as such, making the interest payments, be the **direct customer** of the current holder of the note.

Additionally, TMCC notes that the Department's regulations related to the Property Ratio define "trade accounts" and "trade notes receivable" as only those resulting from the sale of merchandise or the performance of services for customers in the regular course of business of the taxpayer and argues that LSA-R.S. 47:606(A)(1)(h) and LAC 61:I.306.A.1.f should be similarly construed. However, the Department clearly chose not to limit "customers' notes and accounts" for determination of the Sales and Other Revenue Ratio in the same manner. Moreover, allocation of interest income as set forth in the statute and regulation results in a fair allocation of revenue earned by a taxpayer in this state. It also accurately represents the state in which the customer purchased the goods and entered into the note obligating the customer to pay such interest, thus representing the state from which the interest revenues were derived and to which those revenues should be attributable. While taxing statutes are to be liberally construed in favor of the taxpayer, when a tax law is clear and unambiguous and its application leads to no absurd consequences, the law shall be applied as written. Barfield, 185 So. 3d at 785.

---

[18]Pursuant to 2006 amendment of LAC 61:I.306, this section of the Department's regulation was re-designated from LAC 61:I.306.A.1.g to its current designation of LAC 61:I.306.A.1.f, and a portion of subsection of (i) was amended. La. Reg. 32:415 (2006). However, the relevant portion quoted above was not amended, and for ease of reference, we likewise refer to its current designation.

Accordingly, on *de novo* review, we conclude that the interest on the RICs at Issue was "[i]nterest on customers' notes and accounts" as contemplated by LSA-R.S. 47:606(A)(1)(h) and, thus, constitutes "other revenue attributable to Louisiana" in the computation of TMCC's Sales and Other Revenue Ratio pursuant to LSA-R.S. 47:606(A)(1). None of the grounds for a refund of overpayment set forth in LSA-R.S. 47:1621(B) or (C) have been established. For these reasons, we find no merit to TMCC's argument that the BTA erred in granting in part the Department's motion for summary judgment, denying in part TMCC's motion for summary judgment, and dismissing TMCC's claim for refund of franchise taxes it paid pursuant TMCC's computation of its Sales and Revenue Ratio for the Refund Period at issue considering the stipulations herein.

## CONCLUSION

For the above and foregoing reasons, we affirm the portions of the February 10, 2021 judgment of the Board of Tax Appeals: (1) granting in part and denying in part the Department of Revenue's ("the Department's") motion for summary judgment seeking dismissal of Toyota Motor Credit Corporation's ("TMCC's") claims for a refund of franchise tax paid for the franchise tax period of April 1, 2005 through March 31, 2006 ("the 2005 Refund Period"); (2) granting in part and denying in part TMCC's motion for summary judgment as to its claims for a refund of franchise tax paid for the 2005 Refund Period; (3) decreeing that the value of the Retail Installment Contracts at Issue ("RICs at Issue") for the 2005 Refund Period is not allocated to Louisiana and not included in the numerator of TMCC's Property Ratio in the calculation of the apportionment of its franchise tax base; (4) further decreeing that all interest earned on any RICs at Issue for the 2005 Refund Period was properly included in the numerator of TMCC's Sales and Other Revenue Ratio in the calculation of the apportionment of its franchise tax base; (5) further decreeing that TMCC made an overpayment of its Louisiana corporation

franchise tax for the 2005 Refund Period in the amount of $797,517.00 (which represents the amount of franchise tax paid for the 2005 Refund Period resulting from the allocation of the value of the RICs at Issue to Louisiana in the computing of TMCC's Property Ratio); and (6) ordering the Department to refund TMCC that amount together with interest thereon at the rates and for the periods provided in LSA-R.S. 47:1624(A).

Costs of this appeal, in the amount of $5,229.50, are assessed equally between the parties.

**AFFIRMED AS TO THE 2005 REFUND PERIOD.**